# IN THE UNITED STATES CIRCUIT COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

_____

CASE NOS.: 21-14071, 21-14074

_____

COMPULIFE SOFTWARE, INC.,

Appellee / Cross Appellant,

v.

DAVID RUTSTEIN, MOSES NEWMAN, and AARON LEVY,

Appellants / Cross Appellees.

_____

COMPULIFE SOFTWARE, INC.,

Appellee / Cross Appellant,

v.

DAVID RUTSTEIN,

Appellant / Cross Appellee.

_____

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA

_____

## INITIAL BRIEF OF THE APPELLANTS

_____

Gulisano Law, PLLC
Counsel for the Appellants
5645 Coral Ridge Drive, Suite 207
Coral Springs, FL 33076
954-947-3972 – office
954-947-3910 – fax
michael@gulisanolaw.com – email

## CERTIFICATE OF INTERESTED PERSONS

The Appellants, pursuant to Fed. R. App. P. 26.1 and 11th Circuit Rule 26.1-1(a), disclose the following trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of the appeal, including subsidiaries, conglomerates, affiliates, and parent corporations, including any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party:

1.    Allison L. Friedman, P.A. (Trial counsel for Defendants).

2.    Compulife Software, Inc. (Plaintiff/Appellee/Cross Appellant).

3.    Diaz Reus & Targ, LLP (Appellate counsel for Defendant Binyomin Rutstein).

4.    Friedman, Allison, Esquire (Trial counsel for Defendants).

5.    Gulisano Law, PLLC (Appellate counsel for David Rutstein, Moses Newman, and Aaron Levy).

6.    Gulisano, Michael, Esquire (Appellate counsel for David Rutstein, Moses Newman, and Aaron Levy).

7.    Levy, Aaron (Defendant/Appellant/Cross Appellee).

8.    Newman, Moses (Defendant/Appellant/Cross Appellee).

9.    Reinhart, Hon. Bruce, U.S. Magistrate Judge (S.D. Fla.).

10.    Rothman,    Joel,    Esquire    (Trial/appellate    counsel    for Plaintiff/Appellee/Cross Appellant).

11.    Rutstein, Binyomin (Defendant/Appellant/Cross Appellee).

12.    Rutstein, David (Defendant/Appellant/Cross Appellee).

13.    Schneider    IP    Law    (Trial/appellate    counsel    for Plaintiff/Appellee/Cross Appellant)

14.    Schneider,    Jerold,    Esquire    (Trial/appellate    counsel    for Plaintiff/Appellee/Cross Appellant).

15.    Sriplaw,    PLLC    (Trial/appellate    counsel    for Plaintiff/Appellee/Cross Appellant).

## STATEMENT REGARDING ORAL ARGUMENT

The Appellants are willing to participate in oral argument to the extent the Court believes it would be helpful to resolve the issues presented in this appeal.

# TABLE OF CONTENTS

Certificate of Interested Persons                                                   C-1

Statement Regarding Oral Argument                                                    i

Table of Citations                                                                   v

Statement of Subject-Matter and Appellate Jurisdiction                             vii

Statement of the Issues                                                              1

Introduction                                                                         2

Statement of the Case and Facts                                                      2

I.    Compulife's Operations and Database                                           2

II.   Mr. Rutstein, B. Rutstein, Mr. Levy, Mr. Newman, and Related Entities         5

III.  MBM Life Quotes, Inc., Mr. McSweeney, MSCC Corp., and Mr. Steinhardt          7

IV.   Allegations Supporting Misappropriation in the 08 Case                        8

V.    Allegations Supporting Misappropriation in the 42 Case                       11

VI.   Procedural History                                                           14

      A.   First Trial                                                             14

      B.   Compulife I                                                             15

C.  Second Trial                                                        19

D.  Findings of Fact and Conclusions of Law                            20

Standards of Review                                                     25

Summary of the Argument                                                26

Argument and Citations of Authority                                    27

I.   The District Court Erred in Determining that the "Law of the Case"   30
     Doctrine Conclusively Determined that the Transformative Database was
     a Trade Secret, Without Reevaluating that Finding, where the Court
     Granted a new Trial, which Produced New Evidence on that Issue

II.  The District Court Erred in Finding the Acquisition of Insurance Quotes  38
     via Scraping Publicly Available Information was done by "Improper
     Means" under the Florida Uniform Trade Secrets Act where Scraping was
     Conflated with Hacking

III. The District Court Erred in Finding the Volume of Data Acquired via   52
     Scraping was Enough to Qualify as Acquisition by "Improper Means"
     under the Florida Uniform Trade Secrets Act where only 3 Million to 43.5
     Million Quotes out of 63 Billion to 913.5 Billion Quotes were Taken

IV.  The District Court Erred in Finding Mr. Newman and Mr. Levy Jointly   55
     and Severally Liable where their Conduct was not Comparable to Mr.
     Rutstein's Conduct and the Court Conflated Facts from a Separate Case
     that did not Involve Them

Conclusion                                                             59

Certificate of Compliance                                             59

iii

Certificate of Service                                                            60

# TABLE OF CITATIONS

## Case Law

| | |
|---|---|
| *\* Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*, 873 F. Supp. 2d 1192 (N.D. Cal. 2012) | 55 |
| *\* Compulife Software Inc. v. Newman, et al.*, 959 F.3d 1288 (11th Cir. 2020) | 15, 16, 17, 18, 19, 25, 26, 28, 30, 46, 52 |
| *Davis v. Town of Lake Park*, 245 F.3d 1232 (11th Cir. 2001) | 33 |
| *EarthCam, Inc. v. OxBlue Corp.*, 703 F. App'x 803 (11th Cir. 2017) | 35, 36 |
| *\* Fishkin v. Susquehanna Partners, G.P.*, CIV-A-03-3766, 2007 U.S. Dist. LEXIS 19621, 2007 WL 853769 (E.D. Pa. Mar. 19, 2007) | 55 |
| *HGI Assocs., Inc. v. Wetmore Printing Co.*, 427 F.3d 867 (11th Cir. 2005) | 25 |
| *Jackson v. Ala. State Tenure Comm'n*, 405 F.3d 1276 (11th Cir. 2005) | 31, 33 |
| *Owen v. Sec'y for the Dep't of Corr.*, 568 F.3d 894 (11th Cir. 2009) | 25 |
| *\* Physicians Interactive v. Lathian Sys., Inc.*, No. CA 03-1193-A, 2003 WL 2301820, 2003 U.S. Dist. LEXIS 22868 (E.D.Va. Dec. 5, 2003) | 45, 46, 47 |
| *Sandvig v. Barr*, 451 F. Supp. 3d 73 (D.D.C. 2020) | 48 |
| *Sandvig v. Sessions*, 315 F. Supp. 3d 1 (D.D.C. 2018) | 45 |

*Silva v. Baptist Health S. Fla., Inc.*, 838 F. App'x 376 (11th Cir. 2020) ... 30, 31, 32, 33

*Sw. Airlines Co. v. Kiwi.com, Inc.*, No. 3:21-cv-00098-E, 2021 U.S. Dist. LEXIS 187768 (N.D. Tex. Sep. 30, 2021) ... 48, 49

*United States v. Frank*, 599 F.3d 1221 (11th Cir. 2010) ... 25

*United States v. Robinson*, 690 F.2d 869 (11th Cir. 1982) ... 33, 34

*Wheeler v. City of Pleasant Grove*, 746 F.2d 1437 (11th Cir. 1984) ... 30, 34

*Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, 898 F.3d 1279 (11th Cir. 2018) ... 27, 28

**Statutory and Other Authorities**

Fed. R. Civ. P. 52 ... 25, 26

Fla. Stat. § 688.002 ... 27, 28, 29, 51

* Andrew Sellars, *Twenty Years of Web Scraping and the Computer Fraud and Abuse Act*, 24 B. U. J. of Science & Tech. L. 372 (2018) ... 39, 40, 41, 42, 43, 44

## STATEMENT OF SUBJECT-MATTER
## AND APPELLATE JURISDICTION

This is an appeal from a civil action where the district court had original jurisdiction over the Appellee's claims under federal copyright law. District courts have subject-matter jurisdiction under 28 U.S.C. § 1331 over all civil actions arising under federal law. The Appellee also asserted supplemental state law claims. District courts have supplemental jurisdiction over related state law claims pursuant to 28 U.S.C. § 1367.

On October 20, 2021, the district court entered final judgment in favor of the Appellee on its state law claim. This is an appeal of right from that final order. This Court has appellate jurisdiction over final orders entered by district courts under 28 U.S.C. § 1291. The Appellants timely filed a notice of appeal on November 18, 2021.

## STATEMENT OF THE ISSUES

I.    Whether the district court erred in finding that the "law of the case" doctrine conclusively determined the Transformative Database was a trade secret, without reevaluating that finding, where the court granted a new trial, which produced new evidence on that issue.

II.    Whether the district court erred in finding the acquisition of insurance quotes via scraping publicly available information was done by "improper means" under the Florida Uniform Trade Secrets Act where the court conflated scraping with hacking.

III.    Whether the district court erred in finding the volume of data acquired via scraping was enough to qualify as acquisition by "improper means" under the Florida Uniform Trade Secrets Act where only 3 million or 43.5 million quotes out of 63 billion to 913.5 billion quotes were taken.

IV.    Whether the district court erred in finding Mr. Newman and Mr. Levy jointly and severally liable for misappropriation of trade secrets where their conduct was not comparable to Mr. Rutstein's conduct and the court conflated facts from a separate case that did not involve them.

## INTRODUCTION

Appellants, David Rutstein ("Mr. Rutstein"), Moses Newman ("Mr.

1

Newman"), and Aaron Levy ("Mr. Levy") (collectively, the "Appellants") were the defendants below. Appellant, Binyomin Rutstein ("B. Rutstein") was also a defendant below who is represented by separate counsel on appeal. Appellee, Compulife Software, Inc. ("Compulife") was the plaintiff below.

Mr. Rutstein, Mr. Newman, and Mr. Levy appeal the final judgment entered against them in *Compulife Software, Inc. v. Newman, et al.*, Case No. 16-CV-81942 (the "42 Case"), which was consolidated for trial and appeal with *Compulife Software, Inc. v. Rutstein, et al.*, Case No. 16-CV-80808 (the "08 Case"). Mr. Rutstein also appeals the final judgment entered against him in 08 Case. The symbol "Doc." shall refer to the district court docket.

## STATEMENT OF THE CASE AND FACTS

### I. Compulife's Operations and Database

Compulife develops and markets life insurance quotation and comparison software. Doc. 314 at 3, ¶ 1. Robert Barney ("Mr. Barney") founded the company and is its president. Doc. 314 at 3, ¶ 2. "Compulife licenses its software for use by term life insurance agents to perform life insurance policy comparisons." Doc. 314 at 4, ¶ 3. "Compulife licenses its software in a stand-alone version that operates on a personal computer ('the PC version'), and as the 'Compulife Internet Engine' which runs on a server

that can provide insurance quotes to visitors to the Compulife customer's website." Doc. 314 at 4, ¶ 4.

Compulife also operates the website Term4Sale.com, which uses the Compulife Internet Engine software operated on its server. Doc. 314 at 4–5, ¶ 7. Term4Sale.com allows consumers to get free quotes for life insurance. Doc. 314 at 4–5, ¶ 7. Consumers are then directed to life insurance agents who are Compulife customers and pay for this service. Doc. 314 at 4–5, ¶ 7. "Compulife's software relies on a database of life insurance companies' rates that Mr. Barney created." Doc. 314 at 5, ¶ 10.

Compulife's database is culled from information provided by various insurance companies to generate the quotes that appear when using Term4Sale.com or its software. Doc. 286-1 at 2, ¶ 6. Compulife calls its database of insurance-premium information the Transformative Database. Doc. 314 at 2, n.3. "There is a difference between insurance rates and insurance quotes: rates are one of the 'raw materials' used in developing an insurance premium for a policy; rates are never given to a consumer, instead, rates are used to calculate the premium which is given to a consumer to tell them how much the insurance will cost ('the quote')." Doc. 314 at 5, ¶ 10. "Insurance rates are typically public information." Doc. 314 at 5–6, ¶ 11.

"Compulife gets its insurance rate information from rate books and rate charts published by life insurance companies." Doc. 314 at 5–6, ¶ 11. "Some life insurance companies do not publish their rates, but Compulife has relationships with most of these companies to obtain their rate information in a timely manner." Doc. 314 at 5–6, ¶ 11. "Compulife's system includes rate tables from over a hundred insurance companies. Compulife's software uses the rate information to generate quotes mathematically." Doc. 314 at 5–6, ¶ 11.

"For insurance rate information to be useful it must be current; based on the relationships that Compulife has developed, insurance companies provide Compulife with their current rate tables before they are released to the public." Doc. 314 at 6, ¶ 12. "When Compulife receives rate information from insurers, sometimes as frequently as every month, Mr. Barney enters the rate information into Compulife's system using Compulife's software and the database that Compulife designed." Doc. 314 at 6, ¶ 13. Compulife designed an encryption system to prevent the data files from being reverse-engineered. Doc. 314 at 6, ¶ 14. The PC version and the Compulife Internet Engine use the same encrypted data files. Doc. 314 at 6, ¶ 14. Compulife's licensing agreements provide that its software constitutes valuable trade secrets, contains confidential and trade secret material, and that the user will not

duplicate the software except for back-up purposes. Doc. 314 at 9–10, ¶ 22.

"Compulife's licensing agreements prohibit the user from duplicating, reverse compiling, reverse engineering, reformatting, or providing internet web quoting services to sub-users without Compulife's permission." Doc. 314 at 10, ¶ 22. "Compulife's licensing agreements provide that Compulife displays life insurance quotations on the internet through a proprietary system of template files originally created by Compulife, and that the user will not permit sub-users to re-format a quotation on another computer." Doc. 314 at 10, ¶ 22. Compulife's licensing agreements provide that the user's license for its software is not transferable without its written consent. Doc. 314 at 10, ¶ 22.

## II. Mr. Rutstein, B. Rutstein, Mr. Levy, Mr. Newman, and Related Entities

Mr. Rutstein was an insurance agent who was licensed in Florida until his license was revoked in 2012. Doc. 314 at 10, ¶ 23. American Web Designers, Ltd. ("AWD") is owned by his son B. Rutstein and is licensed as an insurance agency. Doc. 314 at 12, ¶ 29. To have a license for an insurance agency in Florida, there must be an individual who stands as the principal. Doc. 314 at 12, ¶ 29. B. Rutstein is the licensed insurance agent for AWD. Doc. 314 at 12, ¶ 29. B. Rutstein gave Mr. Rutstein permission to use his license for

5

AWD. Doc. 314 at 12, ¶ 30. Mr. Rutstein used AWD in conducting insurance business. Doc. 314 at 12, ¶ 32; 14, ¶ 37.

Mr. Rutstein also "founded the National Association of Accredited Insurance Professionals ("NAAIP") and purchased the NAAIP.org domain name in 2010." Doc. 314 at 11, ¶ 24. NAAIP was never incorporated and only exists as a website. Doc. 286-1 at 3, ¶ 28. "NAAIP is a website that creates 'free' websites for life insurance agents." Doc. 314 at 11, ¶ 25. "A key benefit offered by a 'free' NAAIP website is access to NAAIP's 'Life Insurance Quote Engine.'" Doc. 314 at 11, ¶ 25. Visitors to the NAAIP website can "enter certain basic information about their age, insurance rating and type of policy, as well as name telephone number and email address," and the Life Insurance Quote Engine "will provide a list of quotes for term life insurance policies that are available." Doc. 314 at 11, ¶ 25. Ownership of the NAAIP.org website was transferred to Mr. Levy in 2016. Doc. 314 at 11, ¶ 24.

Mr. Rutstein also founded the website BeyondQuotes.com. Doc. 314 at 11, ¶ 26. BeyondQuotes.com also used the Life Insurance Quote Engine, which allowed visitors to enter certain basic personal information and obtain a list of quotes for term life insurance policies. Doc. 314 at 11, ¶ 27; Doc. 286-1 at 3, ¶ 25. "If a visitor wanted to purchase a policy, that visitor becomes a 'lead' that

BeyondQuotes would sell to insurance agents who are its customers." Doc. 314 at 11–12, ¶ 27.

NAAIP's free websites and BeyondQuotes.com used the Life Insurance Quote Engine to provide internet visitors the ability to obtain free quotes for term life insurance policies, the same service provided by Compulife's software and its Term4Sale.com website. Doc. 314 at 12, ¶ 28. Mr. Newman is a computer programmer who began programming for NAAIP in April of 2016. Doc. 314 at 18, ¶ 51. "Mr. Newman was paid for his work from a Paypal account that he thought belonged to Aaron Levy." Doc. 314 at 18, ¶ 51.

### III. MBM Life Quotes, Inc., Mr. McSweeney, MSCC Corp., and Mr. Steinhardt

Brian McSweeney ("Mr. McSweeney") is an insurance agent with MBM Life Quotes, Inc. ("MBM"). Doc. 314 at 12, ¶ 31. MBM was a Compulife customer with a license for the PC version of its software and access to its web quoter. Doc. 314 at 12, ¶ 31. MSCC Corporation ("MSCC"), owned by Michael Steinhardt ("Mr. Steinhardt"), was an authorized re-seller of Compulife's software for approximately 20 years. Doc. 314 at 13, ¶ 33. "MSCC had Compulife's internet quote engine software installed on its website." Doc. 314 at 13, ¶ 33. However, "[u]ntil May 2015, MSCC was not required to sign a

licensing agreement with Compulife or pay it for its use of Compulife's internet quote engine." Doc. 314 at 13, ¶ 33.

## IV. Allegations Supporting Misappropriation in the 08 Case

"Although he did not have a license to do so, David Rutstein put the Compulife 'web quoter' on BeyondQuotes.com, calling it the 'Life Insurance Quote Engine,' sometime around August 2010." Doc. 314 at 11, ¶ 27. Although Mr. Rutstein and B. Rutstein alleged that Mr. Newman developed the Life Insurance Quote Engine, this conflicts with Mr. Rutstein's use of it on BeyondQuotes.com since 2010. *Compare* Doc. 286-1 at 5, ¶ 57 *with* Doc. 314 at 11, ¶ 27.

In 2011, Mr. Rutstein sent an email to Mr. McSweeney and Compulife requesting assistance to put a quote engine on BeyondQuotes.com. Doc. 314 at 13, n.15. The subject line stated "Dear Compulife – I have an account with you through Eric Savage,[1]" then a Compulife licensee, and the email stated in part: "I also work with Brian McSweeney of www.mbmlifequotes.com." Doc. 314 at 13, n.15; Doc. 311 at 181:17–20. A Compulife employee who reviewed the email believed that Mr. Rutstein was a website designer for Mr. Savage and Mr. McSweeney and that they owned BeyondQuotes.com. Doc. 314 at 13, n.15;

---

[1] Mr. Savage was another Compulife licensee.

Doc. 310 at 75:14–25; 76:13–16; 79:7–13. The employee provided the Compulife HTML copyrighted source code to Mr. Rutstein. Doc. 314 at 13, n.15; Doc. 310 at 81:7–11; 106:24–107:6. Had the employee known that BeyondQuotes did not belong to Mr. Savage or Mr. McSweeney and that Mr. Rutstein intended to use the source code without paying a licensing fee, he never would have provided the source code to Mr. Rutstein. Doc. 314 at 13, n.15; Doc. 310 at 107:23–108:7.

Subsequently, Mr. McSweeney instructed MSCC to put a web quoter on BeyondQuotes.com, which was connected to its server. Doc. 314 at 13, ¶ 34. "Mr. Steinhardt believed that BeyondQuotes.com was owned by Mr. McSweeney, although he never verified that." Doc. 314 at 13, ¶ 34. MSCC provided Compulife's HTML source code for the web quoter to be used on BeyondQuotes.com. Doc. 314 at 14, ¶ 35. "A Compulife licensee can only put Compulife's web quoter on their own website; putting it on a website they do not own would be in breach of the license agreement." Doc. 314 at 14, ¶ 36.

Mr. Barney discovered the NAAIP.org webpage in 2015. Doc. 314 at 14, ¶ 38. Mr. Barney recognized portions of Compulife's HTML code in NAAIP's source code. Doc. 314 at 15, ¶ 41. Mr. Barney's investigation led him to the BeyondQuotes.com website, which was also using Compulife's HTML code.

Doc. 314 at 15, ¶ 42. Mr. Barney's investigation of BeyondQuotes.com lead him to Compulife customer Mr. McSweeney. Doc. 314 at 16, ¶ 42.

Mr. Barney contacted Mr. McSweeney who believed that the quotes may have been coming from his account with MSCC. Doc. 314 at 16, ¶ 43. Mr. Barney then contacted Mr. Steinhardt at MSCC. Doc. 314 at 16, ¶ 43. Mr. Steinhardt determined that the account being used to produce the quotes on NAAIP.org belonged to Mr. McSweeney. Doc. 314 at 16, ¶ 43. In April 2015, Mr. Steinhardt disabled Mr. McSweeney's access to the Compulife internet engine software running on MSCC's server, which immediately stopped NAAIP.org websites and BeyondQuotes.com from producing life insurance quotes. Doc. 314 at 16, ¶ 43.

On April 13, 2015, Mr. Rutstein wrote to Mr. McSweeney: "the Compulife guy disabled my quote engines . . . which may have been coming from you." Doc. 314 at 16, ¶ 44. That same day, Mr. Rutstein sent an email to Mr. Barney threatening to steal Compulife's customers. Doc. 314 at 16, ¶ 44; Doc. 308 at 105:3–13. On April 25, 2015, David made similar threats to Compulife's business by email. Doc. 314 at 16, ¶ 44; Doc. 308 at 112:13–19. On June 5, 2015, Mr. Rutstein used Term4Sale.com to generate hundreds of life insurance quotes. Doc. 314 at 16, ¶ 45. After he was presented with each

quote, he sent messages through Term4Sale.com to Compulife's customers stating: "Compulife quote engine: Beware of security flaw. Your back office is not password protected," and provided a hyperlink to NAAIP stating "term life quote engines are free." Doc. 314 at 16, ¶ 45; Doc. 308 at 131:13; 132:10–133:17.

Compulife's quotes began appearing on NAAIP.org websites again in June 2015. Doc. 314 at 17, ¶ 47. Mr. Barney recognized the quotes as his information coming from Compulife's database. Doc. 314 at 17, ¶ 47. Mr. Rutstein "had no authority to use Compulife's software." Doc. 314 at 17, ¶ 48. Mr. Rutstein "never had authority to use Compulife's data to generate life insurance quotes." Doc. 314 at 17, ¶ 48. Compulife never intended to provide such authorization. Doc. 314 at 17, ¶ 48. In response to these activities, "Compulife modified its software to detect and prevent similar situations in the future, such as having its internet engine software check for valid software serial numbers when information is requested from the internet engine and adding a 'watermark' to its insurance quotes." Doc. 314 at 17, ¶ 49.

## V. Allegations Supporting Misappropriation in the 42 Case

Compulife's expert witness testified, "[t]he word scrape is short for screen scraping, and it simply means reading an html document as if you

were viewing it on the screen." Doc. 311 at 92:12–14. "During September 1-4, 2016, Compulife's Term4Sale.com website experienced a 'scraping' attack." Doc. 314 at 18, ¶ 50. "Over 800,000 'get' requests were sent to the Term4Sale.com server, each request consisting of a single line of code." Doc. 314 at 18, ¶ 50. "The Term4Sale server logged the IP address generating each quote request, the date and time the request was made, and the request itself." Doc. 314 at 18, ¶ 50.

"A single internet protocol (IP) address … traced to a computer or server in Jerusalem … sent over 800,000 requests to the Term4Sale server over a four-day period." Doc. 314 at 19, ¶ 52. "[E]ach request used the parameters in Compulife's HTML code while incrementing the corresponding variables one at a time, thus scraping the Compulife database." Doc. 314 at 19, ¶ 52. "The attack on the Compulife internet engine server at Term4Sale.com used the same parameters from the Compulife HTML code—spelled, formatted, and organized identically to how they appear in Compulife's code registered with the Copyright Office." Doc. 314 at 19, ¶ 52. Mr. Newman "testified that an Israeli woman named Matal performed the scraping attack." Doc. 314 at 18, ¶ 51.

"Mr. Newman watched Matal use a computer to send automated

12

requests in a way that was consistent with scraping." Doc. 314 at 18, ¶ 51. "The requests Matal sent were for two zip codes: 10458 in Bronx, New York, and 33433 in Boca Raton, Florida." Doc. 314 at 18–19, ¶¶ 51–52. "Matal took the information from the scraping attack and put it in a large CSV file." Doc. 314 at 18, ¶ 51. Mr. Newman reformatted the information and integrated into the database that provided quote information to NAAIP.org websites. Doc. 314 at 18, ¶ 51. "Mr. Newman acknowledged the information in the CSV file came from Compulife's Term4Sale website." Doc. 314 at 18, ¶ 51.

Compulife's expert witness "estimated the scraping attack produced 43.5 million results." Doc. 314 at 20, ¶ 55. "Compulife estimates that the scraping incident caused 870,000 requests to be made at Term4Sale.com over a four-day period and that each request usually generates 50 quotes, resulting is 43.5 million quotes." Doc. 314 at 20, n.17. Mr. Newman disputed that number, testifying that not every request generates 50 quotes, and "in some instances you are lucky if you got two quotes back." Doc. 311 at 118:2–22; 118:15. Mr. Newman "testified that NAAIP.org's database only contained 'three million or so' quotes." Doc. 314 at 20, ¶ 55. Mr. Newman testified, "nobody ever wants to be scraped" but scraping is widely used on the internet "when we want to buy an airline ticket, we use sites like cheaperair.com or booking.com

for hotels. None of those sites would exist without scraping. Some of them --

all of them have been sued. Now they all have agreements with the airlines,

but they didn't at one point …." Doc. 311 at 119:24–120:9.

"Prior to 2016, Term4Sale.com had *no process* in place by which to

restrict the use of 'get' commands to generate insurance premium quotes."

Doc. 314 at 20, ¶ 56 (emphasis added). "In response to the scraping attack,

Compulife modified its internet engine so that if more than five requests are

quotes are made within one second the software starts slowing down and

produces fewer results." Doc. 314 at 20, ¶ 57. Compulife also added a terms of

use agreement to the Term4Sale website. Doc. 314 at 20, ¶ 57.

## VI. Procedural History

### A. First Trial

In the 08 Case, Compulife asserted claims against Mr. Rutstein and B.

Rutstein for copyright infringement, trade-secret misappropriation under the

Federal Defend Trade Secrets Act ("DTSA") and the Florida Uniform Trade

Secrets Act ("FUTSA"), and violation of Florida's Computer Abuse and Data

Recovery Act (the "Florida CADRA"). Doc. 8. In regards to the

misappropriation claim, Compulife alleged that the Transformative Database

was a trade secret and that Mr. Rutstein and B. Rutstein misappropriated it by

14

accessing the Transformative Database on MSCC's server under false pretenses to generate quotes without permission. Doc. 314 at 2.

In the 42 Case, Compulife asserted claims against Mr. Rutstein, B. Rutstein, Mr. Levy, and Mr. Newman for copyright infringement, trade-secret misappropriation under the DTSA and the FUTSA, and violation of the Florida CADRA. Doc. 8. In regards to the misappropriation claim, Compulife alleged that the Transformative Database was a trade secret and that Mr. Rutstein, B. Rutstein, Mr. Levy, and Mr. Newman misappropriated it by scraping publically available data from Term4Sale.com in 2016. Docs. 1; 8.

The parties consented to a bench trial before a magistrate judge. Doc. 172. Following trial, the court ruled in favor of Mr. Rutstein, B. Rutstein, Mr. Levy, and Mr. Newman on all claims. Docs. 224; 225. As to the misappropriation claim, the court found that Compulife's database was a protectable trade secret but that it had not misappropriated within the meaning of the FUTSA. Docs. 224; 225. Compulife appealed the final judgment. Doc. 239.

B. Compulife I

That appeal lead to this Court's decision in *Compulife Software, Inc. v. Newman, et al.*, 959 F.3d 1288 (11th Cir. 2020) ("Compulife I"). In Compulife I,

the Court found no reversible error in the magistrate judge's rejection of Compulife's claims for violation of the Florida CADRA. *Id.* at 1316–18. However, the Court concluded that the magistrate judge erred in finding that Compulife had not demonstrated either copyright infringement or trade-secret misappropriation. *Id.* The Court noted "[t]he magistrate judge found that Compulife's Transformative Database was a trade secret, a finding that is not clearly erroneous and that, in any event, doesn't seem to be contested on appeal." *Id.* at 1311.

"Although the magistrate judge found Compulife's Transformative Database to be a trade secret, he determined that the defendants hadn't misappropriated it." *Compulife Software, Inc.*, 959 F.3d at 1312. "The magistrate judge's analysis, however, contains two flaws." *Id.* "First, in both in the 08 case and in the 42 case, he failed to consider the several alternative varieties of misappropriation contemplated by FUTSA." *Id.* "The magistrate judge rejected the misappropriation-by-use claims in the 08 case because he found that Compulife had 'failed to prove the existence of the duty critical to its claims of trade secret misappropriation through use.'" *Id.* (quotation omitted). "The judge erred in considering only varieties of misappropriation by use that require a violation of some legal 'duty' external to the statute." *Id.* "Even

assuming that the defendants had no external 'duty' not to use Compulife's trade secret, they nonetheless may have used the secret in violation of the statute." *Id.* at 1313.

"Second, in the 42 case, he erred in reasoning that the public availability of quotes on Compulife's Term4Sale site automatically precluded a finding that scraping those quotes constituted misappropriation." *Compulife Software, Inc.*, 959 F.3d at 1312. The Court explained, "[i]f the scraping attack constituted 'improper means'—a question that the magistrate judge also failed to address—it would be difficult to escape the conclusion that the defendants either (1) used a trade secret of which they had improperly acquired knowledge or (2) used a trade secret of which they had acquired knowledge from a person whom they knew or had reason to know had improperly acquired the knowledge." *Id.* at 1313. "The defendants admitted both to hiring the hacker and to observing her take actions consistent with a scraping attack." *Id.* "It's hard to see how the defendants didn't at least 'have reason to know' that [M]atal had acquired knowledge of a trade secret for them by improper means—*if*, indeed, the scraping attack amounted to improper means." *Id.* (emphasis added).

As to the 42 Case, the Court reasoned, "[t]he magistrate judge treated

the wrong question as decisive—namely, whether the quotes taken were individually protectable. He left undecided the truly determinative questions: (1) whether the block of data that the defendants took was large enough to constitute appropriation of the Transformative Database itself, and (2) whether the means they employed were improper." *Compulife Software, Inc.*, 959 F.3d at 1315. "Having found that the Transformative Database was protectable generally, the magistrate judge was not free simply to observe that the portions taken were not individually protectable trade secrets." *Id.*

The Court vacated the judgment as to copyright infringement and trade-secret misappropriation and remanded for new findings of fact and conclusions of law. *Compulife Software, Inc.*, 959 F.3d at 1318. In doing so, the Court noted, "[w]e express no opinion as to whether enough of the Transformative Database was taken to amount to an acquisition of the trade secret [in the 42 Case], *nor do we opine as to whether the means were improper* such that the acquisition or use of the quotes could amount to misappropriation." *Id.* at 1315 (emphasis added).

Finally, the Court noted that "[t]he magistrate judge retired just days after issuing his decision and wasn't available even to consider Compulife's motion for a new trial." *Compulife Software, Inc.*, 959 F.3d at 1307, n.10. The

18

Court stated, "[l]ike the rest of this case, though, the procedural history here is complicated." *Id.* "Because the issues are technical and complicated, new findings will be necessary here, and the parties will likely be entitled to recall many witnesses should they wish, the substitute judge may be 'satisfied that he cannot perform the duties we have given him.'" *Id.* (quotation omitted). "If so, the [substitute] judge 'may in his discretion grant a new trial.'" *Id.*

C. Second Trial

On remand, the successor judge set the matter for trial. Doc. 273. The successor judge stated that the entire case was being re-tried. Doc. 308 at 3. Specifically, the court stated,

> Based upon my unfamiliarity with the record and with the agreement of the parties, we are conducting this as a new trial. In other words, neither side is limited to the evidence that was presented at the prior proceedings, each side is permitted to introduce whatever evidence they want to introduce even if it was not presented at the first trial.

Doc. 308 at 3:18–23.

At the outset of trial, the court asked if it was bound by the prior trade secret finding under the "law of the case" doctrine. Doc. 308 at 12:9–12. Defense counsel disputed this, stating, "I don't believe the transformative database is a trade secret, so I cannot concede on that." Doc. 308 at 12:17–18.

The court responded, "I will do the research on that. As a matter of law, you waived those arguments or they may be law of the case." Doc. 308 at 12:19–21. In her opening statement, defense counsel stated that the evidence would show the database was not a "trade secret." Doc. 308 at 28:21–23.

D. Findings of Fact and Conclusions of Law

Following the second trial, the successor judge entered findings of fact and conclusions of law. Doc. 314. "In its decision remanding these matters, the Eleventh Circuit made several findings that I am bound by as law-of-the-case." Doc. 314 at 21. One of those findings was "that Compulife's Transformative Database constitutes a trade secret." Doc. 314 at 21. The court noted none of the exceptions to the law of the case doctrine applied. Doc. 314 at 22. "Thus, to the extent that either party attempts to relitigate these issues, I am bound by the Eleventh Circuit's findings and there is no basis for me to engage in reconsideration." Doc. 314 at 22. Therefore, the court's "analysis [wa]s limited to whether Compulife has proven that Defendants misappropriated it." Doc. 314 at 35.

In regards to the 08 Case, the court found that Mr. Rutstein "intentionally misled Compulife in August 2011, which directly resulted in his acquisition of Compulife's Transformative Database without Compulife's

permission." Doc. 314 at 37–38. The court also found that the "subsequent acquisition of the Transformative Database from MSCC was likewise achieved through improper means, in that David Rutstein directed Brian McSweeney (an MSCC account holder) to put BeyondQuotes.com on MSCC's server." Doc. 314 at 38, n.28. "McSweeney accomplished this by deceiving Mr. Steinhart into believing that he owned BeyondQuotes.com." Doc. 314 at 38, n.28.

The court concluded that Mr. Rutstein "unquestionably misrepresented his affiliation and that this is sufficient to establish Defendants' misappropriation of Compulife's trade secret." Doc. 314 at 36. The court also found "that this unlawful acquisition occurred at a time when Compulife was taking reasonable precautions to maintain the secrecy of the Transformative Database, through the use of licensing agreements, which amounts to misappropriation." Doc. 314 at 38. Therefore, the court held Mr. Rutstein and B. Rutstein liable for misappropriation of Compulife's trade secrets in the 08 Case. Doc. 314 at 38.

In regards to the 42 Case, the court found Mr. Newman's "testimony to be credible." Doc. 314 at 38. "Mr. Newman, a computer programmer who worked for NAAIP.org in 2016, testified that at David Rutstein and Aaron

Levy's direction, he watched an Israeli woman named Matal use a computer to send automated requests in a way that was consistent with scraping." Doc. 314 at 38. "Mr. Newman testified that the information Matal scraped came from Compulife." Doc. 314 at 38. "Matal took the information from the scraping attack and put it in a large CSV file, which Mr. Newman then integrated into the database that provided quote information to NAAIP.org websites." Doc. 314 at 38.

The court reasoned, "[a]lthough the individual quotes themselves are not entitled to protection as trade secrets because they are publicly available, I find that so much of the Transformative Database was taken during the scraping attack that it amounted to a protected portion of Compulife's trade secret." Doc. 314 at 39. "Indeed, Ms. Miracle estimated that the scraping attack produced 43.5 million results." Doc. 314 at 39. "The volume of Compulife's data that Defendants acquired during the scraping attack constituted such a significant compilation of information that '[d]erives independent economic value … from … not being readily ascertainable' as to warrant trade secret protection." Doc. 314 at 39 (quotation omitted).

The court noted, "[a]lthough Compulife has plainly given the world implicit permission to access as many quotes as is humanly possible, a robot

can collect more quotes than any human practicably could. So, while manually accessing quotes from Compulife's database is unlikely ever to constitute improper means, using a bot to collect an otherwise infeasible amount of data may well be …." Doc. 314 at 40 (*quoting Compulife Software, Inc.*, 959 F.3d at 1314). The successor judge noted that in Compulife I this Court agreed with a Virginia court's finding that "the trade-secret owner's 'failure to place a usage restriction on its website' did not automatically render the hacking proper," stating, "So too, here." Doc. 314 at 40. For this reason, the court "reject[ed] Defendants' argument that Compulife cannot establish misappropriation due to its failure to restrict use at Term4Sale.com prior to the scraping attack." Doc. 314 at 40.

The court found "[b]ased on the circumstances here, including evidence in the record of *David Rutstein's persistent efforts to sabotage Compulife by luring away its customers* [in the 08 Case], I find that by using a robot to hack the Term4Sale website [in the 42 Case], Defendants intentionally sought to acquire Compulife's trade secrets through improper means." Doc. 314 at 40–41 (emphasis added). "Defendants' subsequent use of the Term4Sale website in a way that was never intended, stealing a significant portion of Compulife's data, and knowingly incorporating that stolen data into its own websites also

constitutes improper means." Doc. 314 at 40–41. "Thus, in the '42 case, Defendants are liable for misappropriation of Compulife's trade secrets through both acquisition and use …." Doc. 314 at 41.

Ultimately, the court found Mr. Rutstein, B. Rutstein, Mr. Levy, and Mr. Newman jointly and severally liable. Doc. 314 at 41–42. The court stated, "the evidence established that all four Defendants were involved in either directly acquiring Compulife's trade secrets or in using these trade secrets for economic gain and/or to the detriment of Compulife." Doc. 314 at 42. "David Rutstein was heavily involved in acquiring Compulife's Transformative Database through misrepresentation and deceit. Mr. Levy and Mr. Moses were directly involved in the scraping attack." Doc. 314 at 42. "Each Defendant played a critical role in the enterprise to misappropriate Compulife's trade secrets, and therefore, joint and several liability is appropriate." Doc. 314 at 42.

The court concluded, "[m]oreover, given the collaborative efforts of all four Defendants, I find that each of them is liable for misappropriating Compulife's trade secrets; thus, Defendants shall be jointly and severally liable for these damages." Doc. 314 at 43–44. Mr. Rutstein, Mr. Newman, and Mr. Levy appeal the final judgment entered against them in the 42 Case on

Compulife's misappropriation claim. Doc. 316. Mr. Rutstein also appeals the final judgment entered against him in the 08 Case on Compulife's misappropriation claim.

## STANDARDS OF REVIEW

On an appeal from a judgment in a bench trial, this Court reviews the district court's conclusions of law *de novo*. *HGI Assocs., Inc. v. Wetmore Printing Co.*, 427 F.3d 867, 873 (11th Cir. 2005). This Court also reviews the district court's application of the law to the facts *de novo*. *United States v. Frank*, 599 F.3d 1221, 1228 (11th Cir. 2010). Mixed questions of law and fact also merit *de novo* review. *Owen v. Sec'y for the Dep't of Corr.*, 568 F.3d 894, 907 (11th Cir. 2009). The district court's findings of fact "shall not be set aside unless clearly erroneous.'" *Compulife Software, Inc.*, 959 F.3d at 1301 (quotation omitted).

"Separately, '[w]hen an appellate court discerns that a district court has failed to make a finding because of an erroneous view of the law, the usual rule is that there should be a remand for further proceedings to permit the trial court to make the missing findings.'" *Compulife Software, Inc.*, 959 F.3d at 1301 (quotation omitted). Findings of fact and conclusions of law are also reviewed to ensure that they satisfy Rule 52(a)(1), which requires the district court "find the facts specially and state its conclusions of law separately." Fed.

R. Civ. P. 52(a)(1). "We will vacate and remand a judgment resulting from a bench trial where 'the findings of the district court do not provide a sufficiently definite predicate for proper appellate review.'" *Compulife Software, Inc.*, 959 F.3d at 1301 (quotation omitted).

## SUMMARY OF THE ARGUMENT

The Appellants raises several arguments on appeal. First, the district court erred in determining that the "law of the case" doctrine conclusively determined that the Transformative Database was a trade secret, without reevaluating that finding, where the court granted a new trial on remand, which produced at least some new evidence on that issue. Second, even if was a trade secret, the district court erred in finding the acquisition of insurance quotes, via scraping publicly available information, was done by "improper means" under the FUTSA because the court erroneously conflated scraping with hacking.

Third, the district court erred in finding the volume of data acquired via scraping was enough to qualify as acquisition by "improper means" under the FUTSA. The evidence reflected that the scraping incident produced only 3 million or 43.5 million quotes out of what appears to be upwards of 63 billion to 913.5 billion quotes in the Transformative Database as a whole. In other

words, although 3 million or 43.5 million quotes is a large number, only a fraction of information was acquired when that information is compared to the Transformative Database as a whole.

Fourth, the district court erred in finding Mr. Newman and Mr. Levy jointly and severally liable based on their limited involvement and/or by conflating the facts from the 08 Case and the 42 Case, which were consolidated for trial, where Mr. Newman and Mr. Levy were not defendants in the 08 Case. Alternatively, this Court should vacate the final judgment against Mr. Newman and Mr. Levy and remand for further proceedings to determine whether the degree of their wrongs, if any, is the same as the degree of wrong of Mr. Rutstein and B. Rutstein before imposing joint and several liability against them.

## ARGUMENT AND CITATIONS OF AUTHORITY

To prove a claim under the FUTSA, a plaintiff "must demonstrate that (1) it possessed a trade secret and (2) the secret was misappropriated." *Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, 898 F.3d 1279, 1297 (11th Cir. 2018) (quotation and quotation marks omitted). Florida law defines a trade secret as

> information … that: (a) [d]erives independent

economic value … from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Fla. Stat. § 688.002(4). "[W]hether something is a trade secret is a question typically 'resolved by a fact finder after full presentation of evidence from each side.'" *Yellowfin Yachts*, 898 F.3d at 1298–99 (quotation omitted).

"Public availability creates a vulnerability, which—if unreasonable—could be inconsistent with the reasonable precautions requisite to trade-secret protection." *Compulife Software, Inc.*, 959 F.3d at 1314 (citing Fla. Stat. § 688.002(4)(b)). However, "[e]ven if measures taken by the trade-secret owner to protect the secret prove to be inadequate, that alone will not render a means of acquisition proper." Doc. 314 at 36 (*quoting Compulife Software, Inc.*, 959 F.3d at 1312). "So long as the precautions taken were reasonable, it doesn't matter that the defendant found a way to circumvent them." *Id.*

A trade secret can be misappropriated by either acquisition, disclosure, or use. *See* Fla. Stat. § 688.002(2). Compulife alleged its trade secret was misappropriated by acquisition and by use. A person misappropriates a trade secret by acquisition when he acquires it and "knows or has reason to know

that the trade secret was acquired by improper means." Fla. Stat. § 688.002(2)(a). A person misappropriates a secret by use if he uses it "without express or implied consent" and either:

> 1. Used improper means to acquire knowledge of the trade secret; or
>
> 2. At the time of disclosure or use, knew or had reason to know that her or his knowledge of the trade secret was:
>
> a. Derived from or through a person who had utilized improper means to acquire it;
>
> b. Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
>
> c. Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
>
> 3. Before a material change of her or his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Fla. Stat. § 688.002(2)(b). "Improper means" for acquiring a trade secret include, "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." Fla. Stat. § 688.002(1). As for what constitutes misappropriation-by-use, this Court has noted that the bar is "generally low" in that "any

29

exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a 'use.'" *Compulife Software Inc.*, 959 F.3d at 1313 (quotation omitted).

## I. District Court Erred in Determining that the "Law of the Case" Doctrine Conclusively Determined that the Transformative Database was a Trade Secret, Without Reevaluating that Finding, where the Court also Granted a new Trial, which Produced New Evidence on that Issue

"The mandate rule is a specific application of the 'law of the case' doctrine[,] which provides that subsequent courts are bound by any findings of fact or conclusions of law made by the court of appeals in a prior appeal of the same case." *Silva v. Baptist Health S. Fla., Inc.*, 838 F. App'x 376, 382 (11th Cir. 2020) (quotation omitted). "A trial court may not alter, amend, or act contrary to the mandate of an appellate court regarding issues that were 'decided expressly or by necessary implication.'" *Id.* at 383.

> However, "the law of the case doctrine does not apply to bar reconsideration of an issue when (1) a subsequent trial produces substantially different evidence, (2) controlling authority has since made a contrary decision of law applicable to that issue, or (3) the prior decision was clearly erroneous and would work manifest injustice."

*Id.* (*quoting Wheeler v. City of Pleasant Grove*, 746 F.2d 1437, 1440 (11th Cir. 1984)).

"When the record changes, which is to say when the evidence and the inferences that may be drawn from it change, the issue presented changes as well." *Jackson v. Ala. State Tenure Comm'n*, 405 F.3d 1276, 1283 (11th Cir. 2005). "The first exception to the doctrine recognizes that the law of the case is the law made on a given set of facts, not law yet to be made on different facts." *Silva*, 838 F. App'x at 383 (*quoting Jackson*, 405 F.3d at 1283). "The first step in the analysis is to identify the legal issues this Court 'actually, or by necessary implication,' decided … [in the prior appeal]." *Jackson*, 405 F.3d at 1283 (quotation omitted).

In *Silva*, the plaintiffs sought monetary damages, injunctive, and declaratory relief against a hospital under the Rehabilitation Act and the Americans with Disabilities Act. *Silva*, 838 F. App'x at 379. The court granted summary judgment in favor of the defendants, finding that plaintiffs lacked Article III standing for injunctive relief. *Id.* On appeal, this Court found the plaintiff had established Article III standing and reserved the order granting summary judgment. *Id.* On remand, the district court held a bench trial on plaintiffs' claims for declaratory and injunctive relief. *Id.* at 380. At trial, the defendants presented additional evidence that suggested the plaintiffs did not have Article III standing. *Id.*

Based on this new evidence, the district court concluded that, at the time of trial, plaintiffs lacked Article III standing for injunctive or declaratory relief because there was no evidence that they would suffer future discrimination if they returned to defendants' hospitals. *Silva*, 838 F. App'x at 380. The court dismissed plaintiffs' claims for lack of standing and they appealed. *Id.* In the second appeal, the plaintiffs argued that the Court's holding in the prior appeal, that the plaintiffs had Article III standing, was binding on remand under the doctrine of law of the case and that the district court violated the Court's mandate by concluding otherwise. *Id.* at 382.

The Court disagreed, finding "the first exception to the law-of-the-case doctrine applies." *Silva*, 838 F. App'x at 382. "The district court was required to assess Plaintiffs' standing at the time of trial in November 2018." *Id.* "And at trial, Baptist presented new evidence regarding its hospitals' policies beginning in 2014 or 2015." *Id.* "This evidence was not part of the summary-judgment record when we decided *Silva* in May 2017, and it showed that Baptist implemented policies mandating live in-person ASL interpreters upon request." *Id.* "So at the time of trial, there was new evidence that Baptist offered live in-person ASL interpreters upon request, which Plaintiffs' counsel admitted was more generous than what federal law demanded." *Id.*

32

The Court concluded, "[l]aw of the case does not apply in this situation because the district court based its standing decision on a different record than did this Court when addressing the propriety of summary judgment." *Silva*, 838 F. App'x at 383. "Our decision in *Silva* said nothing, either expressly or by necessary implication, about whether Plaintiffs established standing based on the trial record, which was substantially different than the summary-judgment record we considered in *Silva*." *Id.* "So, neither law of the case nor the mandate rule applies." *Id.*

In short, law of the case does not apply in situations where a subsequent trial produces substantially different evidence. *See also, Jackson*, 405 F.3d at 1283 ("We need not decide if Jackson's … argument is correct because, even if it is, the evidence before Judge Nelson when he entered judgment as a matter of law was substantially different from the evidence upon which we based our reversal of Judge Propst's grant of summary judgment for the Board."); *Davis v. Town of Lake Park*, 245 F.3d 1232, 1237 n.1 (11th Cir. 2001) ("Law of the case does not apply in this situation because [the later district court judge] based his post-trial order on a different record than [the earlier district court judge] did when addressing summary judgment."); *United States v. Robinson*, 690 F.2d 869, 872 (11th Cir. 1982) ("In deciding the issue of Robinson's consent to go to

the airport office, the prior panel relied upon what has turned out to be, after the proceedings on remand, an erroneous view of the facts. …. In light of this new evidence and its effect on the issue of consent, we decline to adhere to the prior panel's ruling on Robinson's consent to go to the office."); *Wheeler*, 746 F.2d at 1441 (quotation omitted) ("We also see no reason not to apply the law of the case doctrine to this case. Since no hearing was held on remand, the only substantive addition to the record since the last appeal is the district court's opinion. We do not regard this as the equivalent of 'a subsequent trial [which] produce[d] substantially different evidence.'").

Here, at the first trial the magistrate judge found that the Transformative Database was a trade secret. In Compulife I, the Court specifically held that finding was not clearly erroneous. However, the Court also noted neither party contested that finding based on the record then before the Court. The Appellants did not contest that finding because they won at trial. As such, the Appellants did not need to challenge the magistrate's conclusion that the Transformative Database was a trade secret in Compulife I.

Conversely, Compulife got the conclusion it wanted at the first trial on the first element of its FUTSA claim in that the magistrate found the Transformative Database was a trade secret. However, Compulife appealed

34

on the second element as to the magistrate's finding that its trade secret had *not* been misappropriated. Since, at that time there was no dispute that the database was a trade secret and that the Appellants had come into possession of it, the only question in Compulife I was whether the trade secret had been misappropriated. However, on remand, the court granted a new trial. That trial produced additional evidence that was not before this Court in Compulife I.

In *EarthCam, Inc. v. OxBlue Corp.*, 703 F. App'x 803 (11th Cir. 2017), the plaintiff appealed an order granting summary judgment in favor of the defendants on its trade secrets misappropriation claim under the Georgia Trade Secrets Act. There, the defendants were accused of misappropriating the plaintiff's trade secret by conducting a brute force attack on its website. *Id.* at 805. The defendants argued that "the information was 'public,' belonged to third parties, or was general customer or business information." *Id.*

"With respect to the brute force attack," the defendants "maintained that any information they 'scraped' from EarthCam's website was regularly made public by EarthCam, often for marketing purposes." *EarthCam, Inc.*, 703 F. App'x at 806. "And information intentionally publicized by EarthCam could not have derived its economic value from secrecy …." *Id.* "The district court

agreed with this argument, ruling against EarthCam in part because it 'ha[d] not presented any evidence to support that the information gathered in [the brute force attack of] 2006 even potentially derived economic value from not being generally known.'" *Id.* (quotation omitted). There the Court noted,

> Declaring that something is confidential and a trade secret is not the same thing as providing evidence that the information (a) "is not commonly known by or available to the public," (b) "[d]erives economic value … from not being generally known," and (c) "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy."

*Id.* at 812 (quotation omitted).

Here, Compulife alleged that the Transformative Database was a trade secret. Compulife used the Transformative Database to produce insurance quotes for its software and on its website Term4Sale.com. However, to maintain a trade secret, one must employ reasonable precautions to maintain its secrecy. In the 08 Case, Compulife presented evidence that it required its software licensees to agree to licensing agreements restricting their use of the software. Mr. Rutstein acquired access to the Transformative Database through Compulife's licensee MSCC.

However, Compulife did not require MSCC to sign a licensing agreement or pay it for its use of its internet quote engine until May 2015 long

after the allegations supporting misappropriation in 08 Case. In the 08 Case, Mr. Rutstein also acquired access to the Transformative Database by sending Compulife a misleading email in 2011. Compulife provided Mr. Rutstein access to the Transformative Database without verifying the veracity of his statements. While Mr. Rutstein's conduct should not be condoned, Compulife's negligence in handing over its alleged trade secrets based on one email cannot be ignored. How the information was accessed is completely immaterial to the inquiry of whether such information was subject to efforts that are reasonable under the circumstances to maintain its secrecy in order to be considered a trade secret.

In the 42 Case, at all times material hereto, the public was able to access Term4Sale.com to obtain insurance quotes with no limitations imposed on how many quotes could be generated or how those quotes were subsequently used. The insurance quotes themselves were public information or regularly made public by Compulife for marketing purposes. The evidence showed that in 2016, Term4Sale.com was accessed at Mr. Rutstein's behest to generate 3 million or 43.5 million publicly available insurance quotes for two zip codes.

However, Compulife did not prove that the insurance quotes potentially derived economic value from not being generally known. In this regard, a

trade secret, freely accessible by the public, would thus seem like an oxymoron. Compulife's failure to take reasonable precautions to protect its secrets in the 08 Case merited discussion as did its failure to take any reasonable precautions to protect its secrets in the 42 Case . In light of the new evidence and its effect on the finding that the Transformative Database was a trade secret, the district court should have at least reevaluated that finding. The district court erred by failing to do so. In the alternative, the prior decision finding the Transformative Database was a trade secret was clearly erroneous and adhering to that finding would work manifest injustice.

## II. The District Court Erred in Finding the Acquisition of Insurance Quotes via Scraping Publicly Available Information was done by "Improper Means" under the FUTSA where Scraping was Conflated with Hacking

In Compulife I, based on the record that was then before it, the Court determined that the use of bots to scrape a very large amount of information from a website *could* constitute "improper means" for acquiring such information. On remand, the court found the acquisition of a portion of the insurance quotes in the Transformative Database, via the scraping incident, was achieved by "improper means." However, the lower court reached this conclusion because throughout the proceedings, including in Compulife I, scraping was conflated with "hacking," which commentators have noted is

38

fundamental incorrect.

"Web scraping generally refers to the retrieval of content posted on the World Wide Web through the use of a program other than a web browser or an application programming interface (API)." Andrew Sellars, *Twenty Years of Web Scraping and the Computer Fraud and Abuse Act*, 24 B. U. J. of Science & Tech. L. 372, 373 (2018). "In most cases this is done through a computer script that will send tailored queries to websites to retrieve specific pieces of content." *Id.* at 373. "These requests are often sent in an automatically generated series of requests, in order to extract material across an array of websites or a large collection of material from a specific website." *Id.* at 373–74. "The technique has countless applications." *Id.* at 374.

> It can be used to preserve websites, help identify and extract data for analysis, aggregate information from disparate sources, and map out unexplored networks of servers and websites. Its use can help competition by lowering startup information barriers, enable consumers to find deals and discounts in online services, identify and correct issues of algorithmic bias, and introduce new forms of humor and playfulness.

*Id.* at 374–75. "The technique is capable of less appealing uses as well. It can facilitate an invasion of one's sense of privacy, expose content that a website host wished instead to remain hidden, facilitate copyright infringement at

scale, enable new forms of surveillance, or help people cheat in online trivia games." *Id.*

"Given its utility, the technique has been adopted widely." Sellars, 24 B. U. J. of Science & Tech. L. at 375. It has been estimated that "about a quarter of all current web traffic comes from web scrapers." *Id.* However, it has been observed, "[c]ourts have struggled to settle on a common terminology for web scraping, let alone what types of activity should meet the definition." *Id.* at 381. "They have used terms ranging from 'scraping programs,' 'screen scraping,' 'a robot web crawling program,' or use of a 'robot,' 'automatic web browser,' 'webcrawlers,' 'spider,' or, confusingly, a 'search engine.'" *Id.* at 381–82. "Some courts attempt to differentiate between these terms based on how many websites are targeted, how much is copied, or by different steps in the process of data extraction." *Id.* at 382.

"On a broader level, courts can also run astray if they start their analysis at what a human sees at the web browser level and work from there to get to the data that scrapers extract, or *imagine the scraper as an automaton replicating the steps of a human at a faster rate.*" Sellars, 24 B. U. J. of Science & Tech. L. at 384 (emphasis added). "This approach can make it seem as though a website scraper is an elaborate layer on top of a web browser, perhaps adding more of

a burden on the website or going deeper than a normal web browser could."
*Id.* at 384–85. "Most scrapers operate instead on a simpler level, and retrieve
the objects and files used to build a visible webpage before they are rendered
and displayed to the user." *Id.* at 385.

"Programs used by clients to retrieve web resources from servers are
known as 'user agents.' A web browser is one form of user agent. A scraper is
another." Sellars, 24 B. U. J. of Science & Tech. L. at 386. "Either way, a
standard communication between a server and a user agent will start with the
agent making a request to the server for particular information, including the
method of communication (usually GET), the address of the requested
information, and various 'headers' that may contain additional information
relevant to the request, such as the requester's operating system, Internet
Protocol (IP) address, or the address of the website the agent came from." *Id.*
"The server will take that information and use it to formulate an appropriate
response, and then send the requested data." *Id.*

"So when loading a webpage in a web browser the user agent (in that
case, a web browser) sends an HTTP request to the server to obtain the HTML
file that sets forth the content and layout of the webpage." Sellars, 24 B. U. J. of
Science & Tech. L. at 386. "It then issues multiple additional HTTP

transactions with the same server (and likely other servers) to build the various other elements that constitute the web page's contents …." *Id.* "At this layer a scraper works in the same way a web browser does." *Id.* "It sends out HTTP transactions for the web resources that it seeks along the same protocols, and the server sends the same files in return. *The scraper's level of access is just as deep as a web browser's, and the method by which it makes its queries is identical*." *Id.* at 386–87 (emphasis added).

"The principal difference between a scraper and a normal web browser is that the material presented is not rendered and presented to the user; it is instead used for some other purpose." Sellars, 24 B. U. J. of Science & Tech. L. at 387. "This can mean that as to any given web page the load placed on the host's server may in fact be lighter, because the scraper may only need one web resource, rather than the dozens a web-browser might need, in order to extract the relevant information." *Id.* "Properly contextualized, therefore, the access a server provides to a web scraper is highly similar to that provided to a standard web browser." *Id.*

"The scraper requests and receives files using the same protocols as a web browser, and at least in some cases, places less of a load on a website by only retrieving the objects necessary to extract certain information, rather than

all of the material to visually render a website for a human reader." Sellars, 24 B. U. J. of Science & Tech. L. at 387–88. "The difference between a scraper and a web browser comes less from differences in how scrapers access servers, and more from what the scraper does with the information after it is loaded." *Id.* at 388. "After all … a web scraper covers no more ground than a web browser itself, and so the technical access which allows a person to view a website, *should likewise grant someone the ability to scrape the same files*." *Id.* at 398 (emphasis added).

However, "[c]ourts in scraping cases have yet to meaningfully consider what to do with the existing quasi-technical tool that websites and scrapers have used to broker a relationship for the past two decades: the Robots Exclusion Standard, or "robots.txt" standard." Sellars, 24 B. U. J. of Science & Tech. L. at 413. "This standard provides a vehicle for websites to express *whether or not they wish to allow scrapers on their website*, where on the website scrapers should be included or excluded, and whether the HTTP queries the scraper generates should be slowed to avoid overwhelming a website." *Id.* (emphasis added).

"At this point it would be absurd to suggest that web scraping could, or should, be generally prohibited. Indeed, many forms of web scraping provide

43

important benefits to consumers and the public." Sellars, 24 B. U. J. of Science & Tech. L. at 412. "And because most scrapers, if designed appropriately, would be highly similar to the level of access of a human browser, courts should raise an eyebrow at a claim that a scraper should be viewed as an invasive criminal trespasser." *Id.* at 414–15.

Here, this case is not the first instance in which a bot was used to scrape publicly available information from a website. Such claims have generally been brought under the Computer Fraud and Abuse Act (the "CFAA")—the most commonly applied federal law to web scraping—on the grounds that the scraping amounted to "unauthorized access" or "exceeding authorized access" and for breach of contract of the underlying terms of service. However, Compulife did not allege violations of the CFAA. It did bring a claim under the Florida state computer hacking statute. The claim was dismissed because like the CFAA, the Florida CADRA protects networks that "can be accessed only employing a technological access barrier," which was not present in this case.

As noted, the district court found that the scraping of insurance quotes from Term4Sale.com constituted misappropriation of Compulife's trade secrets by acquisition and by use. The rationale behind this finding was that

"by using a robot to *hack* the Term4Sale website, Defendants intentionally sought to acquire Compulife's trade secrets through improper means." Doc. 314 at 40 (emphasis added). However, the court failed to define or otherwise elaborate on the difference between hacking and scraping. Scraping is not hacking because it does not involve bypassing any security measure. Scraping simply involves using a computer program or script to make multiple requests to a website faster than a human could by hand.

For example, it is not hacking for someone to use a calculator to solve math problems instead of working them out by hand. In *Sandvig v. Sessions*, 315 F. Supp. 3d 1 (D.D.C. 2018), the Court noted:

> That plaintiffs wish to scrape data from websites rather than manually record information does not change the analysis. *Scraping is merely a technological advance that makes information collection easier*; it is not meaningfully different from using a tape recorder instead of taking written notes, or using the panorama function on a smartphone instead of taking a series of photos from different positions. And … the information plaintiffs seek is located in a public forum.

*Id.* at 16 (emphasis added).

The district court concluded that scraping is improper by relying on this Court's consideration of *Physicians Interactive v. Lathian Sys., Inc.*, No. CA 03-

1193-A, 2003 WL 2301820, 2003 U.S. Dist. LEXIS 22868 (E.D.Va. Dec. 5, 2003) in

Compulife I. There the Court cited *Physicians Interactive* as "the most closely

analogous case of which we are aware." *Compulife Software, Inc.*, 959 F.3d at

1314. The Court noted that in *Physicians Interactive*, the "district court held that

hacking a public-facing website with a bot amounted 'improper means.'" *Id.*

However, the instant case involves a completely different factual situation,

and *Physicians* does not support the conclusion that the Appellants acquired

the insurance quotes at issue through improper means.

In *Physicians Interactive*, the plaintiff ran a website for physicians

featuring medical product and pharmaceutical data. *Physicians Interactive*,

2003 U.S. Dist. LEXIS 22868, at *3. On its file server, the plaintiff maintained an

extensive confidential electronic database of the physicians and other medical

professionals who use its service. *Id.* This database, which included the

medical professional's name, title, occupation, specialty, mailing address, e-

mail address, telephone number, and fax number, was the website's most

valuable asset. *Id.* The plaintiff's file server was connected to the Internet and

was accessible by others. *Id.*

However, the public did not have access to the plaintiff's data lists of

medical professionals. *Physicians Interactive*, 2003 U.S. Dist. LEXIS 22868, at *3.

In order to "make full use" of the plaintiff's website, a visitor needed a user password and a personal identification number issued by the plaintiff. *Id.* The plaintiff alleged the defendants "hacked its website by sending electronic robots to steal its customer list, computer code, and confidential data." *Id.* The defendants launched various "attacks" on plaintiff's file servers to obtain the proprietary medical professional information stored on plaintiff's website. *Id.* At the outset, the *Physicians Interactive* court defined the term "hack" as "to explore and manipulate the workings of a computer or other technological device or system, either for the purpose of understanding how it works or to gain unauthorized access." *Id.* at *1, n.1 (quotation omitted).

Importantly, the court found that the plaintiff's "information stored on its computer file server was not meant for the public domain and, therefore, was not stored in the public area of the website." *Physicians Interactive*, 2003 U.S. Dist. LEXIS 22868, at *24. As such, the court held "[t]here can be no doubt that the use of a computer software robot to hack into a computer system and to take or copy proprietary information is an improper means to obtain a trade secret, and thus is misappropriation under the VUTSA." *Id.* at *25. For this reason, the court found that plaintiff was likely to succeed on the merits of its misappropriation claim and granted a preliminary injunction. *Id.*

47

However, *Physicians Interactive* is readily distinguishable from the instant case. Significantly, in *Physicians*, the information at issue was not stored in the public area of the website and visitors needed a password and identification number before the plaintiff's confidential data could be accessed. Thus, *Physicians* involved "hacking" into a computer system, which was not meant for the public, without authorization to obtain confidential information by circumventing reasonable restrictions in place to prevent it.

In the 42 Case, in contrast, there was no allegation that the Appellants hacked into Compulife's computer system in order to obtain confidential information or trade secrets. The evidence showed that the insurance quotes were stored in the public portion of Term4Sale.com and the public had unrestricted access to generate insurance quotes on the website without the need for a password or identification number. *See generally, Sandvig v. Barr*, 451 F. Supp. 3d 73, 85 (D.D.C. 2020) ("Because many websites on the internet are open to public inspection, a website or portion of a website becomes 'private' only if it is 'delineated as private through use of a permission requirement of some sort.'").

For example, in *Sw. Airlines Co. v. Kiwi.com, Inc.*, No. 3:21-cv-00098-E, 2021 U.S. Dist. LEXIS 187768 (N.D. Tex. Sep. 30, 2021), the plaintiff alleged that

the defendant operated an online travel agency and engaged in "unauthorized scraping of flight and pricing data and unauthorized sales of Southwest tickets." *Id.* at *3. Unlike the instant case, the use of plaintiff's website was subject to terms and conditions, which users had to affirmatively acknowledge and accept by clicking a button. *Id.* Those terms and conditions expressly prohibited "attempts to 'page scrape' flight data and use of the website for any commercial purpose without authorization …." *Id.* Ultimately, the court granted the plaintiff's motion for an injunction, finding that "Kiwi breached the [website's] Terms by scraping Southwest flight data and fare from Southwest's website, presenting Southwest flight data on kiwi.com, and selling Southwest flights without authorization." *Id.* at *11-12.

Here, Compulife may not have anticipated that someone would use the Term4Sale.com website to generate 3 million or 43.5 million quotes over a period of several days. This Court noted as much in Compulife I. However, since 25% of all internet traffic consists of scrapers, Compulife should have anticipated as such and should have implemented reasonable precautions to guard against it. However, there was no evidence presented that Compulife made use of the Robots Exclusion Standard, or "robots.txt" standard, to restrict or prohibit scrapers from accessing Term4Sale.com. In fact, "the public

49

was able to [visit Term4Sale.com] and pull quotes without any restriction"
before the scraping incident occurred in 2016. Doc. 310 at 15:1-5. There was
evidence that *after* the scraping incident occurred, Compulife finally took
steps to limit or prevent future scrapers by adding a terms of use agreement to
Term4Sale.com and by implementing restrictions to slow multiple HTTP
queries and limit the number of insurance quotes that can be generated by the
public.

Equating scraping with illegal hacking creates dangerous precedent. It
would suggest that, in the context of accessing publicly available data, it may
be illegal for a computer to access what is perfectly legal for a human to access
simply because the computer can do it faster. Scraping is such a widely
accepted practice that ironically enough—to establish that its trade secrets
were misappropriated by scraping—Compulife relied extensively on data
which itself had been *scraped* by archive.org, also known as, the Wayback
Machine. Doc. 308 at 59; 89; 90–91; 93; 94; 970–100. The Wayback Machine
works by scraping websites in order to reproduce exact copies of those
websites as they existed at any given time. Doc. 311 at 44. Under Compulife's
own theory, the Wayback Machine also misappropriated its trade secrets. In
fact, Mr. Rutstein could have acquired the same insurance quotes via the

50

Wayback Machine's reproductions of Compulife's Term4Sale.com website, without actually visiting that website directly.

Either way, in this case, no "hacking" occurred. Rather, a widely known internet practice was utilized to obtain publicly available information, insurance quotes, from a public website, Term4Sale.com, that—at the time the information was obtained—did not contain any technological or contractual use restrictions or limitations on the amount of insurance quotes that a visitor could generate or what they could do with those quotes. The scraper's level of access to Term4Sale.com was just as deep as a standard web browser and the method by which it made its queries was identical.

The scraper covered no more ground than a web browser could and so the technical access which Compulife allowed human visitors to view its website, should likewise grant someone the ability to scrape the same files. Under the facts presented in the 42 Case, the 2016 scraping incident was not "improper means" as it did not involve "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." Fla. Stat. § 688.002(1). Therefore, Compulife should not have recovered for misappropriation of trade secrets in the 42 Case based on the scraping incident.

51

**III. The District Court Erred in Finding the Volume of Data Acquired via Scraping was Enough to Qualify as Acquisition by "Improper Means" under the FUTSA where only 3 Million to 43.5 Million Quotes out of 63 Billion to 913.5 Billion Quotes were Taken**

As to the 42 Case, in Compulife I, the Court noted, "[e]ven if [the insurance] quotes aren't trade secrets, taking *enough of them* must amount to misappropriation of the underlying secret at some point." *Compulife Software, Inc.*, 959 F.3d at 1314 (emphasis added). The Court reasoned "[o]therwise, there would be no substance to trade-secret protections for 'compilations,' which the law clearly provides." *Id.* The Court instructed the trial court to consider "whether the block of data that the defendants took was large enough to constitute appropriation of the Transformative Database itself." *Id.* at 1315.

On remand, the district court found that "[a]lthough the individual quotes themselves are not entitled to protection as trade secrets because they are publicly available, I find that *so much of* the Transformative Database was taken during the scraping attack that it amounted to a protected portion of Compulife's trade secret." Doc. 314 at 39 (emphasis added). "Indeed, Ms. Miracle estimated that the scraping attack produced 43.5 million results." Doc. 314 at 39. "The volume of Compulife's data that Defendants acquired during

the scraping attack constituted such a significant compilation of information that '[d]erives independent economic value . . . from . . . not being readily ascertainable' as to warrant trade secret protection." Doc. 314 at 39 (quotation omitted).

However, the court did not elaborate how it reached this conclusion. It would appear the court erred in its reasoning by incorrectly focusing on the projected 43.5 million quotes potentially generated during the scraping incident. The court seems to assume a "significant portion" of the trade secret was taken simply based on 43.5 million being such a large number. First, Compulife's expert witness only estimated that the scraping incident produced 43.5 million quotes. Mr. Newman testified that only 3 million to 3.5 million quotes were produced by the scraping incident. The court's undo significance placed solely on the *number* of quotes that were acquired, as opposed to a comparison of the number of quotes taken from the total number of quotes in the database, is reflected in its statement, "Mr. Newman agreed that three and a half million quotes was not an insignificant amount …." Doc. 314 at 20 ¶ 55.

Second, Compulife never established the total number of quotes in the Transformative Database. However, that number can be reasonably estimated.

The Transformative Database can produce insurance quotes for 53 states and territories and all 42,000 zip codes in the United States. The scraping incident produced 3 million to 43.5 million insurance quotes for only (2) two of the zip codes in the Transformative Database. As such, it appears there are at least 1.5 million to 21.75 million quotes for each zip code in the Transformative Database. Therefore, the Transformative Database as a whole contains upwards of 63 billion to 913.5 billion insurance quotes.

When considered in the proper context, only a small portion of the Transformative Database was acquired in the scraping incident compared to the database as a whole. 3 million to 43.5 million quotes is not a "significant portion" of a database containing 63 billion to 913.5 billion insurance quotes. Data for two (2) zip codes is not a "significant portion" of a database containing data for 42,000 zip codes. Data for two (2) states is not a "significant portion" of a database containing data for 53 states and territories. Therefore, the district court's finding that a large enough quantity of insurance quotes was taken during the scraping incident as to amount to misappropriation of Compulife's trade secret is simply not supported.

**IV. The District Court Erred in Finding Mr. Newman and Mr. Levy Jointly and Several Liable where their Conduct was not Comparable to Mr. Rutstein's Conduct and the Court Conflated Facts from a Separate Case that did not Involve Them**

Although it appears this issue has not been definitively determined by Florida courts, courts outside this Circuit have addressed the circumstances in which joint and several liability for misappropriation of trade secrets would be appropriate. For example, the Northern District of California has observed that joint and several liability for misappropriation claims is "reasonable where the degree of wrong is the same among the several defendants." *Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*, 873 F. Supp. 2d 1192, 1218 (N.D. Cal. 2012) (applying California law, which has been found substantially similar to the FUTSA). The Eastern District of Pennsylvania has adopted the same view. *Fishkin v. Susquehanna Partners, G.P.*, CIV-A-03-3766, 2007 U.S. Dist. LEXIS 19621, 2007 WL 853769, at *3 (E.D. Pa. Mar. 19, 2007) ("[J]oint and several liability for trade secret misappropriation … [is] reasonable where the degree of wrong is the same among the several defendants.").

Here, the district court ultimately found Mr. Levy and Mr. Newman jointly and severally liable for misappropriation of Compulife's trade secrets in the 42 Case. However, absent from court's findings of fact and conclusions

of law was any discussion on the degree of fault of each alleged joint tortfeasor. Doc. 314 at 41–42. In other words, the district court did not address the extent to which a person's conduct would make that person accountable for misappropriation of trade secrets committed by another person or persons. Yet, all of the allegations in the 42 Case and the 08 Case involved Mr. Rutstein or actions taken at his request for the benefit of NAAIP and BeyondQuotes over a period of several years. As such, the degree of Mr. Newman or Mr. Levy's wrongs, if any, would be much lesser than that of Mr. Rutstein.

For example, the wrongful conduct supporting liability for misappropriation in the 08 Case was Mr. Rutstein's intentional misrepresentations to obtain access to the Transformative Database for NAAIP and BeyondQuotes in 2011. Doc. 314 at 13, ¶¶ 34; 34, n. 15; 35. However, Mr. Newman and Mr. Levy were not defendants in the 08 Case. In this regard, the district court appears to have conflated the facts involving Mr. Rutstein from the 08 Case, to support its finding that Mr. Newman and Mr. Levy were jointly and severally liable in the 42 Case. Therefore, the district court's imposition of joint and several liability against Mr. Newman and Mr. Levy in the 42 Case, by considering Mr. Rutstein's 2011 intentional misrepresentations at issue in the 08 case, was clearly erroneous.

The wrongful conduct supporting liability for misappropriation in the 42 Case was the 2016 scraping incident conducted by Matal. However, Matal was hired by Mr. Rutstein for the benefit of NAAIP.org and BeyondQuotes.com, websites he created and operated. Mr. Newman did not personally conduct the scraping incident. His involvement, at the direction of Mr. Rutstein in accord with the terms of his employment, was to reformat and incorporate the scraped data into the database that provided quote information for NAAIP. Although Mr. Newman later confirmed that Matal had carried out the scraping attack on Compulife, the court did not indicate when he learned. Doc. 314 at 18, n.16.

Mr. Levy's involvement was that Mr. Rutstein transferred ownership of the NAAIP.org domain name to him at some point in 2016. Beyond that, Mr. Levy's only involvement was to pay Mr. Newman for his programming services. Tellingly, there was no evidence that Mr. Newman and Mr. Levy, in any capacity other than as employees or independent contractors of Mr. Rutstein or his entities, acquired, disclosed, or otherwise used any trade secrets scraped from Compulife in 2016. Moreover, the record does not indicate that Mr. Newman or Mr. Levy personally benefited from the scraping incident as opposed to Mr. Rutstein and his entities. Florida law should not

57

hold Mr. Newman and Mr. Levy jointly and severally liable for Mr. Rutstein's intentional conduct under the circumstances, merely because they were employed by him or because their actions benefited his entities. Consequently, the district court incorrectly held Mr. Newman and Mr. Levy jointly and severally liable for the conduct of Mr. Rutstein without comparing the degree of their wrongs to the degree of wrongs committed by Mr. Rutstein and B. Rutstein.

Alternatively, this Court should at least vacate the judgment against Mr. Newman and Mr. Levy in the 42 Case and remand for further proceedings for the district court to determine whether the degree of their wrongs, if any, is the same as the degree of wrong of Mr. Rutstein and B. Rutstein before imposing joint and several liability against them. The district court did not make such a comparison because of its erroneous view of the law on the circumstances in which joint and several liability for misappropriation of trade secrets would be appropriate. Conversely, the applicable law suggests that joint and several liability for misappropriation is appropriate only when the degree of wrong is the same among defendants. Thus, a remand would be appropriate here to allow the district court to make the missing findings.

## CONCLUSION

For the foregoing reasons, Mr. Rutstein, Mr. Newman, and Mr. Levy respectfully request this Court reverse the final judgment entered in favor of Compulife in the 42 Case. Mr. Rutstein also respectfully requests this Court reverse the final judgment entered in favor of Compulife in the 08 Case. This matter should then be remanded to the district court for further proceedings.

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), this brief uses a monospaced typeface and contains 12,823 words. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6).

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing was served electronically to all registered users that have appeared in this matter on June 15, 2022. The Notice of Electronic Filing for this document is incorporated by reference for identifying those parties who were served electronically and the times of service.

Respectfully submitted by:

Gulisano Law, PLLC
5645 Coral Ridge Drive, Suite 207
Coral Springs, FL 33076
954-947-3972 – office
954-947-3910 – fax
michael@gulisanolaw.com – email

<u>s/ Michael Gulisano</u>
Michael Gulisano, Esquire
Florida Bar No.: 87573